2006 OK 85

**STATE of Oklahoma EX REL. OKLA-HOMA BAR ASSOCIATION, Complainant,**

v.

**Patricia Ann ALLFORD, Respondent.**

**SCBD No. 4964.**

Supreme Court of Oklahoma.

Nov. 14, 2006.

Mike Speegle, Oklahoma City, OK, for Oklahoma Bar Association.

Gordon R. Melson, Seminole, OK, for Respondent.

COLBERT, J.

¶1 The Oklahoma Bar Association filed this disciplinary proceeding against Patricia Ann Allford. The Bar and Allford stipulated to the facts and jointly requested that Allford

receive a private reprimand. At a hearing before a panel of the Professional Responsibility Tribunal (PRT), Allford contradicted many of the facts to which she had stipulated, demonstrated a failure to comprehend the seriousness of her actions, refused to acknowledge her culpability, and expressed little remorse. The PRT unanimously recommended that she receive a public reprimand. We reject that recommendation and suspend Allford from the practice of law for six months.

## STANDARD OF REVIEW

¶2 This Court has original and exclusive jurisdiction over all matters having to do with the admission or discipline of persons admitted to the practice of law in Oklahoma. Rule 1.1 of the Rules Governing Disciplinary Proceedings, Okla. Stat. tit. 5, ch. 1, app. 1-A (2001). In this Court's *de novo* review of disciplinary proceedings, we are not bound by the parties' admissions or stipulations. *State ex rel. Okla. Bar Ass'n v. Beasley*, 2006 OK 49, ¶8, 142 P.3d 410, 413 (citing *State ex rel. Okla. Bar Ass'n v. Donnelly*, 1992 OK 164, ¶11, 848 P.2d 543, 545). The PRT's recommendation is advisory only. *State ex rel Okla. Bar Ass'n v. Wilburn*, 2006 OK 50, ¶4, 142 P.3d 420, 422.

¶3 "We have a constitutional, nondelegable responsibility to decide whether misconduct has occurred and what discipline is appropriate." *Id.* ¶3, 142 P.3d at 422. To discharge this responsibility, we must reexamine the record and assess the weight and credibility of the evidence to determine whether the attorney's misconduct is established by clear and convincing evidence. *Beasley*, 2006 OK 49, ¶8, 142 P.3d at 413. If it is, we must impose the appropriate discipline. *Id.*

## DISCUSSION

¶4 The record contains the complaint filed by the Bar, Allford's response, the PRT's report, and the transcript of the hearing before the PRT with the parties' stipulations and other evidence attached. The Bar formally waived its opportunity to brief the matter and Allford did not file a brief.

¶5 This disciplinary proceeding arises from Allford's representation of a single client. Richard Mackey paid Allford $750 on March 30, 1992, to probate his mother's and father's estates.[1] The probate was not completed by October 16, 2001, when Mackey terminated Allford's services by a letter in which he stated that she "had failed to keep appointments or return phone calls to review and discuss the completion of the case." Allford would not return the file and persuaded Mackey to let her attempt to finish the matter.

¶6 The probate remained incomplete on January 24, 2003, when Mackey sent another letter terminating Allford and asking for the return of the file. Once again, Allford refused to return the file and persuaded Mackey to allow her to complete the case.

¶7 Mackey filed a written grievance with the Bar on April 9, 2004. The Bar opened a formal investigation and sent a letter to Allford on April 27, 2004, asking her to respond to Mackey's allegations within twenty days. When she finally responded on June 1, 2004, Allford did not respond to the allegations, but stated only that she had been unable to contact Mackey.

¶8 The Bar sent Allford a second letter by certified mail on June 9, 2004, and directed her to respond to Mackey's allegations within five days. Although Allford received the letter on July 1, 2004, she did not respond until Tuesday, July 20, 2004. She still did not respond to the allegations, but stated only:

I have met with Mr. Richard Watson Mackey and he desires that I continue with the probate case on his parents. I have completed an inventory of the real property, which contains fifteen legal descriptions for mineral and surface interests in four counties. An accounting is being prepared regarding the income produced by these interests.

---

1. Although the parties stipulated that Allford was hired on February 30, 1992, the receipt Allford gave Mackey reflects a date of March 30, 1992.

I anticipate this estate will be completed within the next six months. This is satisfactory with Mr. Mackey. I will keep you posted.

¶ 9 At this point, the Bar issued a subpoena for Allford's deposition, to take place at the Oklahoma Bar Center on July 29, 2004, at 9:00 a.m. Allford did not appear. Instead, she called the Assistant General Counsel, Mike Speegle, at approximately 9:20 a.m. on the day of her scheduled deposition and stated that she did not appear at the appointed time because Mackey did not want her to.

¶ 10 Although Allford eventually did appear by agreement for her deposition, troubling facts surfaced about the events surrounding her receipt of the subpoena. Employees at the Hughes County Sheriff's office called Allford when they received the subpoena. Allford came to the Sheriff's office and accepted personal service on Friday, July 23, 2004, at 8:00 a.m. However, she asked two of the Sheriff's employees to falsify the date of service to show that it was not served until 8:00 a.m. on July 29th (the date of the scheduled deposition). Because she assured them that the "matter would be dropped and that it wasn't a big deal," the employees honored her request. They admitted their role in the deception when the Bar called the Sheriff's office on the morning of the 28th (the day before the scheduled deposition) to confirm that Allford had been served with the subpoena.

¶ 11 The Bar filed a formal complaint on September 24, 2004. When Allford filed her response on November 15, 2004, she attached Mackey's affidavit stating that he wished to withdraw his grievance and continue the probate with Allford as his attorney. The disciplinary matter was continued several times and Allford finally completed the probate sometime in 2005.

¶ 12 When the hearing before the PRT convened, Allford formally stipulated to the Bar's allegations, admitting that she had repeatedly refused to return Mackey's file and that she had asked the Sheriff's employees to falsify the service date on the subpoena. All-

ford's testimony, however, differed materially from her stipulations. Although she repeatedly affirmed the truth of the stipulations and stated that "I accept full responsibility," and "I was dilatory," her responses to specific questions by the panel members were less apologetic and full of inconsistencies between her stated desire to accept full responsibility and her efforts to deflect any real culpability by admitting only to "mistakes." She described her "stipulations" as an *Alford* plea.[2]

¶ 13 Allford began by attributing the situation to the complexity of the probate case and her lack of skill: "I no longer practice in that area of the law. It's not something that I enjoy doing or felt very skilled at doing." She then attributed her failure to keep appointments with Mackey to simple mis-communication and lack of a full-time secretary. Finally, she implied that she failed to return phone calls because Mackey would "call right back" after she had already explained "things" to him.

¶ 14 Allford's testimony contained so many internal inconsistencies that it was apparent she was not willing to admit to any of the facts underlying the stipulations. Allford's testimony upon being confronted is equally troubling.

[Allford]: What happened was, I want to take full responsibility for that. They asked me what date do you want us to put on this and I said I don't care, put whatever date you want to, in a fit of anger and I was very upset and just not thinking clearly.

[PRT]: What you have admitted to in these stipulations is different than what you've just testified to.

[Allford]: Yes. Yes, I have.

[PRT]: Stipulations say you admitted asking them to put a false date on there. Now you're saying you didn't really ask that, but instead you said put whatever date you want to on there? There's a big difference there.

---

**2.** An *Alford* plea allows a criminal defendant to plead guilty while maintaining her innocence. *Gilson v. State*, 2000 OK CR 14, ¶ 16 n. 2, 8 P.3d

883, 898 n. 2 (citing *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970)).

[Allford]: There's a big difference, but that's what I said to them and I realize this affidavit was drafted by the assistant district attorney and that was drafted in the worst light towards me, but I want to accept full responsibility. I should not have said that. I should have accepted the papers. I should not have put them in any kind of jeopardy.

[PRT]: Did you ask them to specifically put a false date on there? Not just put any date you want to, but did you ask them to put a false date on there?

[Allford]: I asked them to put whatever they wanted to on it, that I didn't care, in a fit of anger that day.

[PRT]: The **AFFIDAVIT** ... said you came in and asked that we ... show that it was served on July 29th at 8 o'clock a.m. Is that a true or false statement?

[Allford]: That's a true statement.

[PRT]: That's different than what you just testified to.

[Allford]: It is, but I will agree with that statement, yes.

[PRT]: That concerns me. That means you may have given false testimony to us just now by saying put whatever date in that you want to.

[Allford]: I agree to this because I do not want them to be in jeopardy. I should have accepted the papers. They have families. It could be their jobs and—and yes, I agree with this.

[PRT]: Let's be—let's be clear. Did you ask [her] to put the date of July 29th on the papers?

[Allford]: If that's what the **AFFIDAVIT** says, yes.

Allford was also quite certain that she had admitted her behavior during the deposition, but could not remember specifically what she admitted.

¶ 15 Allford stipulated that she violated Rules 1.1, 1.2, 1.3, 1.4, 4.1(a), & 8.4(a-d) of the Rules of Professional Conduct, Okla. Stat. tit. 5, ch. 1, app. 3–A (2001), addressing competence, diligence, client communication, truthfulness, and conduct involving dishonesty and trustworthiness.[3] The Bar also alleged that

---

3. The text of those rules is:
RULE 1.1 COMPETENCE
   A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.
RULE 1.2 SCOPE OF REPRESENTATION
   (a) A lawyer shall abide by a client's decisions concerning the objectives of representation, subject to paragraphs (b), (c), and (d) and shall consult with the client as to the means by which they are to be pursued. A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter. In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.
   (b) A lawyer may limit the objectives of the representation if the client consents after consultation.
   (c) A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, but a lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning or application of the law.
   (d) When a lawyer knows that a client expects assistance not permitted by the Rules of Professional Conduct or other law, the lawyer shall consult with the client regarding the relevant limitations on the lawyer's conduct.
RULE 1.3 DILIGENCE
   A lawyer shall act with reasonable diligence and promptness in representing a client.
RULE 1.4 COMMUNICATION·
   (a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.
   (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.
RULE 4.1 TRUTHFULNESS IN STATEMENTS TO OTHERS
   In the course of representing a client a lawyer shall not knowingly:
   (a) make a false statement of material fact or law to a third person. . . .
RULE 8.4 MISCONDUCT
   It is professional misconduct for a lawyer to:
   (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
   (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;
   (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
   (d) engage in conduct that is prejudicial to the administration of justice. . . .

Allford violated Rules 1.3 and 5.2 of the Rules Governing Disciplinary Proceedings, Okla. Stat., tit. 5, ch. 1, app. 1–A (2001), by violating the Rules of Professional Conduct and by failing to cooperate in the Bar's investigation.[4]

¶ 16 We are inexorably drawn to the conclusion that even a public censure is insufficient in this matter. The primary problem is no longer Allford's dilatory representation of her client; it is her refusal to acknowledge the Bar's and this Court's authority to oversee her practice and investigate a complaint against her. Allford has failed to accept any real responsibility for her actions. Even the dry, written transcript of her testimony before the PRT displays a degree of irritation toward the Bar and the disciplinary process at odds with the respect demanded of those *permitted* to practice law in this state. Allford was clearly saying whatever was necessary to get through the process and go on.

¶ 17 The record provides no basis for concluding that Allford's behavior and attitude will improve if she is allowed to continue her legal practice without interruption. Moreover, the facts of Allford's misconduct bring into question her professional judgment and expose an attitude of misplaced irritation and a habit of ignoring a growing problem in hopes that it will simply disappear. These characteristics are at odds with the mature,

thoughtful, and professional approach to any matter required of attorneys.

¶ 18 Disciplinary cases involving attorneys who have deliberately falsified or caused others to falsify sworn legal documents are not common, but certain cases provide guidance regarding the appropriate discipline. In *In re Reinstatement of Jones*, 2006 OK 33, 142 P.3d 380, we considered the reinstatement of an attorney who had resigned pending disciplinary proceedings. One of the two grievances involved behavior that led to her plea of guilty to the "misdemeanor crime of Falsely Performing a Notorial Act." *Id.* ¶ 3, 142 P.3d at 381. That attorney left the practice of law voluntarily, not because of discipline meted out by this Court, but her absence from the legal profession is a good measure of the seriousness with which this Court and the Bar should view the willful misuse of the legal process.

¶ 19 In *State ex rel Oklahoma Bar Association v. Pacenza*, 2006 OK 23, 136 P.3d 616, we made several observations that have equal force in this matter.

[T]here are some matters so serious that mitigating factors will seldom override the requirement of substantial discipline.... [O]ffenses against common honesty should be clear, even to the youngest lawyers;

Rules of Professional Conduct, Okla. Stat., tit. 5, ch. 1, app. 3–A (2001).

4. The text of those rules is:

RULE 1.3  DISCIPLINE FOR ACT CONTRARY TO PRESCRIBED STANDARDS OF CONDUCT
   The commission by any lawyer of any act contrary to prescribed standards of conduct, whether in the course of his professional capacity, or otherwise, which act would reasonably be found to bring discredit upon the legal profession, shall be grounds for disciplinary action, whether or not the act is a felony or misdemeanor, or a crime at all. Conviction in a criminal proceeding is not a condition precedent to the imposition of discipline.
RULE 5.2  INVESTIGATIONS
   After making such preliminary investigation as the General Counsel may deem appropriate, the General Counsel shall either (1) notify the person filing the grievance and the lawyer that the allegations of the grievance are inadequate, incomplete, or insufficient to warrant the further attention of the Commission, provided that such

action shall be reported to the Commission at its next meeting, or (2) file and serve a copy of the grievance (or, in the case of an investigation instituted on the part of the General Counsel or the Commission without the filing of a signed grievance, a recital of the relevant facts or allegations) upon the lawyer, who shall thereafter make a written response which contains a full and fair disclosure of all the facts and circumstances pertaining to the respondent lawyer's alleged misconduct unless the respondent's refusal to do so is predicated on express constitutional grounds. Deliberate misrepresentation in such response shall itself be ground for discipline. The failure of a lawyer to answer within twenty (20) days after service of the grievance (or recital of facts or allegations), or such further time as may be granted by the General Counsel, shall be grounds for discipline. The General Counsel shall make such further investigation of the grievance and response as the General Counsel may deem appropriate before taking any action.
Rules Governing Disciplinary Proceedings, Okla. Stat., tit. 5, ch. 1, app. 1–A (2001).

and to distinguished practitioners, their grievousness should be even clearer.

Honesty and integrity are the cornerstones of the legal profession. Nothing reflects more negatively upon the profession than deceit. There can be little doubt that the attorney has brought discredit upon the legal profession.

*Id.* ¶¶ 32–33, 136 P.3d at 629 (footnotes omitted). *Pacenza,* although it involved much more grievous behavior, provides some guidance. The attorney in that case had been disciplined twice before, was the subject of a new grievance involving significant and extensive dishonesty, and showed no remorse or concern for the individuals harmed by his behavior. We suspended that attorney for two years and one day, effectively disbarring him. *Id.* ¶ 34 n. 71, 136 P.3d at 630 n. 71; *see also State ex rel. Okla. Bar Ass'n v. Dobbs,* 2004 OK 46, 94 P.3d 31 (attorney who knowingly filed a false affidavit, falsely notarized another affidavit, and repeatedly lied under oath suspended for two years and one day).

¶ 20 In contrast to the attorney in *Pacenza,* Allford has never before received any formal discipline. Her behavior, although unacceptable, did not result in a client or a member of the public suffering a legal or financial loss. Indeed, the attempted stipulations, however clumsy, reflected her effort to avoid having others lose their jobs because of her actions. We reject the Bar's suggestion of a private reprimand and the PRT's suggestion of a public censure and conclude that a 6–month suspension is the appropriate discipline. Allford is also ordered to pay costs of $1,115.22 within ninety days of the effective date of this order. Rule 6.16 of the Rules Governing Disciplinary Proceedings, Okla. Stat., tit. 5, ch. 1, app. 1–A (2001).

**RESPONDENT SUSPENDED FOR SIX MONTHS; COSTS ASSESSED.**

CONCUR: WATT, C.J., WINCHESTER, V.C.J., LAVENDER, OPALA, KAUGER, EDMONDSON, TAYLOR, COLBERT, JJ.

NOT PARTICIPATING: HARGRAVE, J.